IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:19CR003 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS J. CLOSE, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Justin E. Herdman, United States Attorney,

and Carol M. Skutnik, Assistant United States Attorney, respectfully submit this memorandum

setting forth the United States' position regarding the sentencing of Thomas J. Close.  The

parties have submitted a Crim. R. 11(c)(1)(C) Plea Agreement for the Court's consideration that

contemplates a prison term in the Guidelines range of 324 to 405 months.  For the reasons set

forth below and those to be articulated at the sentencing hearing, the United States urges the

Court to accept the Plea Agreement and impose a term of incarceration of 405 months.

Respectfully submitted,

JUSTIN E. HERDMAN,
United States Attorney

By:     /s/ Carol M. Skutnik
        Carol M. Skutnik (OH: 0059704)
        Assistant U.S. Attorney
        Suite 400, U.S. Courthouse
        801 West Superior Avenue
        Cleveland, Ohio 44113–1852
        Tel. No. (216) 622-3785
        E-mail: carol.skutnik@usdoj.gov

## I.    __FACTUAL BACKGROUND__

Thomas Close was known to many in the Boy Scouts as "Aqua Joe," a name that now brings sadness, fear, anger and mistrust to those that have learned of his offense conduct.  From 2011 through 2018, Close abused his position as a troop leader and swim instructor with the Boy Scouts of America by surreptitiously recording young boys while they changed for swimming or showers.  He transferred those recorded images from a simple spy watch to his home computers in carefully labeled folders and file structures.  The investigation would later inform us that Close victimized children in his care at the YMCA, the Willard Conservation League, the Firelands Scout Reservation, the Ashland County-West Holmes Career Center, the Mohican Wilderness camp, the STEM camp, and even his own home in Shelby, Ohio.

Close was crafty and careful.  While he dabbled in file sharing platforms like Gigatribe, he primarily focused on the TOR network and a Russian picture repository to protect his anonymity.  He distributed a small percentage of the images he personally recorded when he thought it would benefit him.  Even then he tried to crop out identifiers or limit who he shared with.  Mostly, Close maintained these videos as his personal treasure.

However, Close's offense conduct did not end with the images he created.  As discussed below, Close maintained a cache of child exploitation files rarely if ever seen in this district.  His collection of images pulled from the dark web ranged from infants and toddlers, to bondage, to large folders of nudity and child modeling shots.  Close never deleted any of them – transferring them year after year as he upgraded his computers.  In his interview with law enforcement Close worried that people would only see him as a monster and professed that he never [intentionally] hurt a child.

A.     THE DISCOVERY OF IMAGES ON THE DARK WEB

In May of 2018, the Department of Homeland Security (HSI) Cleveland received information from the Cyber Crimes Center (C3), Child Exploitation Investigations Unit (CEIU) regarding a child exploitation lead in Sandusky, OH.  C3 provided several videos that were taken of minor boys changing before or after swimming, with a series of lockers visible in some of the pictures.  The National Center for Missing and Exploited Children (NCMEC) confirmed that these videos were seen in previous child pornography investigations but the children depicted in the images had not yet been identified.  However, the NCMEC Victim Identification Lab was able to identify the manufacturer of the lockers as the Bradley Corp.  Since only a few YMCA's had purchased lockers from Bradley Corp, C3 was later able to confirm that the images were likely taken at the YMCA facility located in Sandusky, OH.  Therefore, the lead was sent to Cleveland.

With little to go on, Cleveland HSI agents set out to identify the boys depicted in the videos.  SA Benjamin Shaw reviewed a video from the C3 lead that depicted a constructed bathroom with plywood doors resembling those found at a campground.  One of the boys wore a belt with the Boy Scouts logo on the buckle.  A third video set appeared to depict two private bathrooms.  One bathroom had a wooden goose towel rack on the wall.  A fourth video appeared to be taken in a white fabric tee-pee, possibly located at a campground.   A fifth set of videos were taken in another locker room that had cinderblock walls with a wooden bench on one side.

Further investigation, including consultation with the YMCA and the Boy Scouts of America (BSA), Lake Erie Counsel, confirmed that some of the videos were recorded at the Sandusky, Ohio YMCA and the Firelands Scout Reservation in Wakeman, Ohio.  Due to the fact that nearly all of the photos appeared to revolve around changing before or after swimming,

investigators believed the target was involved with BSA in an aquatics capacity.  BSA provided

HSI with an incident report from 2017 written by a den leader regarding a BSA staff member

named Thomas CLOSE, aka "Aqua Joe." The report did not describe any overt illegal behavior

but detailed observations that the den leader described as the unnecessary and repeated touching

of scouts.  BSA informed the agents that they spoke to CLOSE about the report and told him that

if another incident happened they would fire him[1].

B.      THE KNOCK AND TALK

On November 1, 2018, HSI Agents Shaw and Guyton knocked on Close's door in

Shelby, Ohio.  Close agreed to speak with the agents and invited them inside.  During the

meeting, SA Shaw obtained permission to use Close's bathroom.  While inside, SA Shaw

observed the same wooden towel rack depicted in one of the recovered videos.  Agents also

confirmed that Close had a pool in his backyard.  SA Shaw informed Close that they were at his

residence to discuss images of children that were posted online and that they believed some of

the images were taken at his residence.  They further informed him that he was free to leave but

they were going to detain the residence to obtain a search warrant.

Close spoke to the agents for nearly three hours.  He initially thought the agents were

there because he was booted out of scouts for being too "chummy" with the kids.  He continued,

saying that he did not have a "good side to the story" but that he "tried to never hurt a kid."

From the outset, Close admitted to what he had done.  He told agents "I mean yeah look, this can

take a little bit or it can take a while, but I mean you guys know I did something I shouldn't have

done.  I mean there's no reason to drag it out or anything like that."

---

[1] BSA later fired Close while the investigation was pending.

4

Close was shown cropped/sanitized images from the videos provided by C3 and he began to name some of the boys depicted in the images.  He then admitted that he accessed a child pornography forum on The Onion Router (TOR) network, which allows for anonymous browsing on the internet.  He also admitted to using a Russian photo sharing site about 10 years ago to try to access child pornography.  He admitted to uploading some of the videos he recorded to these sites and to trading some images online.

Close informed agents that the videos he recorded were saved on his computer(s) by year.  Forensics later confirmed that Close saved the videos in folders labeled with the year and sometimes the location.  Some of the folders included first names of children.  Close stated he used a spy watch or a miniature camcorder to record the videos.  He also admitted to downloading images of child pornography from the internet and saving them in a folder called "stuff."

Agents asked Close if he thought the Boy Scouts were aware of him taking the videos.  He responded "I figured that is why they were booting me out.  This woman made a complaint, she was actually pretty crazy.  I think she just got lucky, uh or I got unlucky, however you want to look at it."  Close continued: "She was saying I was too chummy with the kids.  Maybe I was too friendly in terms of … I was just patting shoulders, and high-fives and fist bumps and that sort of stuff but … I don't know, she might have seen something in me."

Close told the agents that he was sexually interest in boys and adult women.  His age preference for children was 5 or 6 up to age 18 but acknowledged he could have downloaded images of children on his computer as young as infant or toddler.  He stated he downloaded almost everything that was posted to [the site] and saved it in the "stuff" folder.  He denied ever touching a child in a sexual manner but did state that he posted stories about sex with children on

TOR that he completely made up.  All in all, Close estimated he had 5 terabytes of child pornography.

    C.    <u>THE FORENSIC ANALYSIS OF CLOSE'S DEVICES</u>

HSI agents obtained and executed a federal search warrant at Close's residence on November 1, 2018.  They seized an Apple iPad, a Samsung Galaxy S5 phone, a home built tower PC, seven hard drives, four micro SD cards, and an Ethcnogot Spy Watch from the residence. The Ashland County-West Holmes Career Center also provided Close's work laptop and three flash drives to the agents.

    1.    <u>Images of child pornography downloaded from the internet</u>

HSI Cleveland received assistance from SA Shaun Kuzia (HSI Phoenix, AZ) who was detailed to assist in the review of the downloaded images found on Close's 5 TB tower computer.  SA Kuzia located more than 110,000 image and video files that depicted minors engaged in sexually explicit conduct.  Approximately 60,000 of those files were unique images. This was consistent with Close's statements to law enforcement that he did not delete any images and that he continuously transferred the contents of his old computer to each new computer that he purchased.  These images included depictions of male and female prepubescent children engaged in various sexual acts, including: an image of a young girl with a collar on her neck made to perform oral sex on an adult male; a nude infant with an adult male penis pressed against her vagina; a nude boy with his hands and feet bound wearing a collar while he is anally penetrated; and a nude boy forced to perform oral sex on an adult male.

The forensic exam further revealed more than 800,000 image and video files depicting child exploitative content (meaning images that depict child erotica or images that were deemed age difficult).  Of these, approximately 570,000 were unique images.  This category also

included images of minors involved in nudism, bathing, beach or swimming photos, and modeling poses.  According to the report, SA Kuzia observed large sets of nude and clothed modeling photo shoots.  This was consistent with Close's earlier statements to HSI agents that he preferred images of nudity.  Finally, SA Kuzia bookmarked approximately 160,000 image and video files that simply depicted children.

In summary:

| Category | Images | Unique | Video | Unique | Total |
|---|---|---|---|---|---|
| Child Abuse Material (CAM) - Illegal | 107312 | 60442 | 7232 | 3078 | 114544 |
| Child Exploitive (non-CAM) / Age Difficult | 762059 | 540669 | 47647 | 31137 | 809706 |
| Comparison Images | 0 | 0 | 3909 | 3667 | 3909 |
| Non-Pertinent | 168719 | 128096 | 207 | 72 | 168926 |
| Uncategorized | 40767 | 31215 | 6178 | 5025 | 46945 |
| CGI / Animation - Child Exploitive | 2075 | 1963 | 1 | 1 | 2076 |
| Total | 1080932 | 762385 | 65174 | 42980 | 1146106 |

2.    Results from NCMEC for the downloaded images/videos

The images and videos recovered from Close's computers were sent to NCMEC, where they were compared with the NCMEC Child Recognition & Identification System (CRIS).  CRIS identified 10,241 image files and 363 video files from 300 separate identified series.

3.    Child pornography videos recorded by Close

In December of 2018, SA Shaw located all eleven videos from the original C3 lead on Close's 5 TB desktop computer.   Minor Victim #1 and Minor Victim #2 were identified and interviewed prior to the Indictment returned on January 3, 2019.  The images of these victims

were among the images distributed on the dark web[2].  The agency quickly created a tip line for parents to contact HSI if they believed their child was among the thousands of videos recorded by Close.  From November 9, 2018 through November 20, 2018, HSI agents in Ohio and Michigan returned calls to people that telephoned the tip line.

The agents also reviewed the folder structures, often sorted by dates and locations, looking for clues that would help them identify the children in the videos.  The folders were sorted by years from 2011 to 2018 and numerous agents assisted in the review of the contents of the folders.  The videos were sorted by agents into categories of child pornography[3], attempted child pornography, and videos where the device was set to record children but no actual children were recorded.  The sorting process also attempted to categorize the number of children depicted in the videos.  The following chart summarizes the results:

| FOLDER | Total Files | Produced CP | Attempted CP (W/O Children) | Victimizations |
|---|---|---|---|---|
|  |  |  |  |  |
| 2011 Camp / 2011 | 153 | 124 | 29 | 127 / 27 |
| 2012 Camp | 404 | 206 | 159 (39) | 237 |
| 2013 | 510 | 250 | 167 (93) | 381 |
| 2014 | 316 | 157 | 100 (59) | 271 |
| 2015 | 518 | 334 | 107 (77) | 337 |
| 2016 | 485 | 330 | 129 (26) | 504 |
| 2017 | 358 | 302 | 43 (13) | 705 |
| 2018 | 301 | 203 | 53 (45) | 473 |
| TOTALS: | 3,045 | 1,906 | 787 (352) | 3,062 |

---

[2] According to NCMEC, some of these videos were previously recovered in two separate Gigatribe investigations.

[3] The agents were briefed and relied upon the factors first set forth in United States v. Dost, 636 F. Supp. 828 (S.D. Cal. 1986), and later addressed in United States v. Weigand, 812 F.2d 1239 (9th Cir. 1987), United States v. Brown, 579 F.3d 672, (6th Cir. 2009) cert. denied, 130 S.Ct. 1106 (2010), United States v. Villard, 885 F.2d 117, 122 (3d Cir. 1989).

SA Shaw developed a massive spreadsheet with the videos that were categorized as child pornography.  He included any names from the folder structure of information gleaned from the images.  The spreadsheet also included information gathered from the tip line and from meetings with the Boy Scouts of America[4].  Agents did identify and interview eight additional production victims in April of 2019.   Then in May of 2019, SA Shaw and AUSA Skutnik met with Thomas Close and his counsel, Jeffrey Lazarus.  Close reviewed numerous cropped and sanitized screen captures from the recorded videos and provided information regarding the identity of some of the minors depicted therein.

Thereafter, HSI continued the complex process of trying to identify the children depicted in the 1,900 videos of child pornography created by Close.  During the week of August 5, 2019 through August 8, 2019, HSI agents, forensic interviewers and victim specialists met with parents and minors and confirmed the identities of 37 additional victims.  Another round of 80 minor victims were identified through interviews on September 10, 2019 through September 12, 2019[5].  Finally, on December 3, 11, and 12, 2019, interviews confirmed the identities of 15 additional minor victims.  That brought the total to 143 identified victims of production.

---

[4] HSI was limited in the information they could share with non-law enforcement personnel based upon their statutory duty to protect the identity of the minor victims.

[5] Thomas Close pleaded guilty pursuant to a Rule 11(c)(1)(C) Plea Agreement on September 3, 2019.

## II.   THE UNITED STATES SENTENCING GUIDELINES AND THE DEFENDANT'S PLEA AGREEMENT

Thomas Close pleaded guilty pursuant to a Crim. R. 11(c)(1)(C) Plea Agreement on

September 3, 2019.  The Plea Agreement memorialized the binding nature of the document in

the following relevant language:

> Pursuant Rule 11(c)(1)(C) and after  considering the factors in 18
> U.S.C. § 3553(a), the parties agree that the appropriate disposition
> of this case is for Defendant to receive a sentence within the
> United States Sentencing Guidelines range of 324 months to 405
> months imprisonment .  Defendant understands that the Court may
> accept this plea agreement, reject it, or defer a decision until the
> Court has reviewed the Presentence Report.  If the Court rejects the
> plea agreement, Rule 11(c)(5) will require the Court to inform the
> parties that the Court rejects the plea agreement, give Defendant an
> opportunity to withdraw the plea, and advise Defendant that if the
> plea is not withdrawn, the Court may dispose of the case less
> favorably toward Defendant than the plea agreement contemplates.

(R. 19: Plea Agreement, PageID 54).  The proposed binding agreement was reached by the

parties after calculating the Guidelines in the following fashion[6]:

### Counts 1-2: 18 U.S.C. § 2251(a) Sexual Exploitation of Children

| | | |
|---|---|---|
| Base Offense Level | 32 | §2G2.1(a) |
| Minor under 12 | +4 | §2G2.1(b)(1)(A) |
| Knowing distribution | +2 | §2G2.1(b)(3) |
| Minor in care or supervisory control of Defendant | +2 | §2G2.1(b)(5) |
| **Subtotal Before Acceptance of Responsibility** | **40** | |

### Unindicted victims: 18 U.S.C. § 2251(a) Sexual Exploitation of Children

| | | |
|---|---|---|
| Base Offense Level | 32 | §2G2.1(a) |
| Minor under 12 | +4 | §2G2.1(b)(1)(B) |

---

[6] The practice of creating pseudo counts for unindicted victims of Sexual Exploitation of Children, in violation of 18 U.S.C. §2251(a), was a practice commonly employed in the past by U.S. Pretrial and Probation in the Northern District of Ohio.  (See e.g. U.S. v. Christopher Goodin, NDOH Case No. 1:18CR00617, and U.S. v. Daniel B. Fleischer, NDOH Case NO. 4:18CR209).  This allowed the parties to strategically account for the additional victims that were identified after the Indictment without seeking a Superseding Indictment.

| Minor in care or supervisory control of Defendant | +2 | §2G2.1(b)(5) |
|---|---|---|
| **Subtotal Before Acceptance of Responsibility** | **38** | |

**Count 3: Title 18 U.S.C. §2252(a)(2): Receipt and Distribution of Visual Depictions of a Real Minor Engaged in Sexually Explicit Conduct**

| | | |
|---|---|---|
| Base Offense Level | 22 | §2G2.2(a)(2) |
| Prepubescent minor or minor under 12 | +2 | §2G2.2(b)(2) |
| Knowing distribution | +2 | §2G2.2(b)(3)(F) |
| Sadistic/masochistic conduct or sexual abuse of infant/toddler | +4 | §2G2.2(b)(4) |
| Pattern of activity | +5 | §2G2.2(b)(5) |
| Use of computer | +2 | §2G2.2(b)(6) |
| 600 or more images | +5 | §2G2.2(b)(7)(D) |
| **Subtotal Before Acceptance of Responsibility** | **42** | |

**Multiple Count Adjustment**

| | | |
|---|---|---|
| Highest offense level (Count 3) | 42 | §3D1.4 |
| 5 additional units for Counts 1-2 and relevant conduct, (Count 3 does not group with production counts) | +5 | §3D1.2 & 1.4 |
| **Subtotal Before Acceptance of Responsibility** | **47** | |
| Acceptance of Responsibility | **-3** | §3E1.1 |
| **Adjusted Offense Level** (moves to a level **43**) | **44** | Chapter 5, Application Note 2 |

The proposed binding Plea Agreement contemplates a prison range consistent with a two-level variance below the stipulated Guidelines calculations in the Plea Agreement. The United States urges the Court to accept this recommended range.

The final Presentence Investigation Report issued January 8, 2020, also calculates Thomas Closes' Guidelines range at a Criminal History Category I with an offense level of 43, resulting in an advisory sentencing range of 960 months[7]. (R. 22: Sealed PSR). However, the U.S. Pretrial and Probation Department now takes the position that they cannot create pseudo

---

[7] The Guidelines range is life but the maximum consecutive prison terms adds up to 960 months.

counts for additional victims of Sexual Exploitation of Children, in violation of 18 U.S.C. §2251(a), as the victimization of an additional victim does not constitute relevant conduct to the victimization of the indicted victim.  Nevertheless, the final PSR accounts for the additional victims through the application of the Chapter Four enhancement for pattern of activity pursuant to USSG §4B1.5(b)(1).

USSG §4B1.5(b)(1) adds a five-level enhancement if (1) the instant offense of conviction is a covered sex crime; (2) neither §4B1.1 (Career Offender) or §4B1.5(a) (covered sex crime where defendant has at least one prior sex offense conviction) applies; and (3) the defendant engaged in a pattern of activity involving prohibited sexual conduct.  For the reasons outlined below, this Guideline provision properly applies to Close.

The Commentary to §4B1.5 defines a covered sex crime as an offense perpetrated against a minor that is contained in either Chapter 109A or Chapter 110 of Title 18.  It does not include trafficking in, receipt of, or possession of child pornography[8].  Close has pleaded guilty to two counts of Sexual Exploitation of Children, in violation of 18 U.S.C. §2251(a).  This statute is found in Chapter 110 and does not fit within any of the exclusions.  Second, this case is not covered under §4B1.1 or §4B1.5(a).  Third, Close did in fact engage in a pattern of activity involving prohibited sexual conduct.

The definition for "prohibited sexual conduct" is found in Application Note #4(A)(ii) of the Commentary includes "the production of child pornography."  Application Note #4(B)(i) further requires that the defendant engaged in prohibited sexual conduct with a minor on at least

---

[8] Other exclusions apply that are not relevant to this case.

two separate occasions.  Here we know that Close produced child pornography of at least 143 minors in the time span of eight years.  Therefore, this enhancement is properly applied.

With all that being said, the Government again urges the Court to accept the binding Plea Agreement executed by the parties and impose a sentence consistent with the terms of the agreement.  The Government specifically requests a sentence of 405 months.  However, if the Court rejects the Plea Agreement and proceeds with sentencing after a Crim. R. 11(c)(5) colloquy and the consent of the defendant, the Government agrees that the Guidelines calculation in the final PSR is proper.

## III.    APPLICATION OF § 3553(A) FACTORS

### A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to the Statement of Facts section above and the Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.

### B.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Close was raised by two parents in Shelby, Ohio and had a positive relationship with his grandparents and siblings.  He states he was abused by a slightly older cousin and bullied as a child.  He had no major illnesses, injuries, or hospitalizations but describes a deep depression after his father passed away.  He further states he had thoughts of self-harm in the past.  He denies any illicit drug use.

Close graduated at the top of his class in high school and received a Bachelor of Arts in Mathematics and Computer Science from Bowling Green State University (BGSU).  He was enrolled as a graduate student at BGSU and Kent State University from 2002 to 2009 but did not complete his thesis for a master's degree in mathematics.  He also participated in online courses in 2012 and 2013.

13

Close has been gainfully employed since high school.  From 2002 to 2018, he worked as a seasonal employee for the Boy Scouts of America as a summer camp counselor/aquatic's director at Avery Hand Camp and Firelands Scout Reservation in Wakeman, Ohio.  He was also employed by North Central College in Mansfield, Ohio, as a part-time professor.  He obtained full-time employment at the Ashland County-West Holmes Career Center in 2012 teaching engineering.

C.  NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. *See* United States v. Irey, 612 F.3d 1160, 1206 (11th Cir. 2010).  The Irey court cited the Senate Report regarding this provision:

> This purpose—essentially the "just desserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75–76, 1984 U.S.C.C.A.N. 3258-59). Id.

In Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense and provide for any general or specific deterrence. United States v. Bistline, 665 F.3d 767-68 (6th Cir. 2012).  In this case, the sentencing range contemplated by the parties' Plea Agreement would accomplish this goal.

D.  NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission all believe that general deterrence is a very important factor when fashioning an appropriate sentence. United States v.

14

Irey, 612 F.3d 1160, 1206 (citing United States v. Ferber, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product). In fact, the Bistline Court reversed a district court that failed to see any importance in general deterrence. See United States v. Bistline, 665 F.3d 758, 767 (6th Cir. 2012). The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case." Id. The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" Id. (citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

Ironically, Close knew that child pornography offenses could carry a very severe sentence. He told HSI agents in his interview that he had enough child pornography to send him away for life. He also told the agents that he didn't share much material on the dark web because he didn't want to get busted. Later, Close told the agents that "people download 5 images and they go to jail for 20 years and stuff."

Despite the fact that Close and others who have an overwhelming sexual desire for children may not be deterred even if the sentence for the crime was life, it is also true that others would certainly not be deterred if Close received a low sentence. Clearly, these offenders talk to each other in chatrooms and covert networks and they are concerned enough about law enforcement to encrypt their hard drives, lurk on the dark web, and seek foreign websites in an effort to prevent detection. There is much to be gained by a significant sentence—increased safety for our children.

E.     THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC
        FROM FURTHER CRIMES OF THE DEFENDANT

This is the factor involving the incapacitation or specific deterrence of the defendant that

the court is to consider. See Irey, 612 F.3d at 1210.  Congress and this Circuit have recognized

that sex offenders have a high rate of recidivism.  Notably, the Sixth Circuit stated in United

States v. Richardson, 349 Fed. Appx. 38, 44 (6th Cir. 2009), that there are, "long-standing

concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision

periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose

criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to

disappear within a few years of release from prison. Richardson, 349 Fed. Appx. 38, 44 (6th Cir.

2009) (quoting, H.R.Rep. No. 108-66, at 49-50 (2003) (Conf.Rep.), reprinted in 2003

U.S.C.C.A.N. 683, 684.).

As Judge Posner wrote:

> We need evidence-driven law just as we need evidence-driven
> medicine. Statistical analysis of sex crimes has shown that the best
> predictor of recidivism is not deportment at an interview but sexual
> interest in children. R. Karl Hanson, Kelley E. Morton & Andrew
> J.R. Harris, "Sexual Offender Recidivism Risk: What We Know
> and What We Need to Know," 989 Annals of the N.Y. Academy
> of Sciences 154, 157 (2003) (tab.1).  Some studies show a high
> rate of recidivism among pedophilic sex offenders generally,
> ranging from 10 percent to 50 percent.  Ryan C.W. Hall & Richard
> C.W. Hall, "A Profile of Pedophilia: Definition, Characteristics of
> Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,"
> 82 Mayo Clinic Proceedings 457, 467 (2007).  Another study
> found that only 6.8 percent of consumers of child pornography had
> been charged with a new child pornography offense within 4 years
> but that the percentage rose to 9.5 percent within 6 years. Angela
> W. Eke, Michael C. Seto & Jennette Williams, "Examining the
> Criminal History and Future Offending of Child Pornography
> Offenders: An Extended Prospective Follow up Study," Law &
> Human Behavior, Nov. 19, 2010 (tab.1),
> www.springerlink.com/content/h4616862621x8616/ (visited June

23, 2011). <u>United States v. Garthus</u>, 652 F.3d 715, 720 (7th Cir.
2011) (emphasis supplied).

Further, these estimates of recidivism may actually be low, as is acknowledged as a limitation by Eke, Seto, & Williams, "Our reliance on official records for both criminal history and re-offending may have limited the strength of the association that we could find, as both are underestimates of true offending."  Eke, Seto, & Williams, "Examining the Criminal History and Future Offending of Child Pornography Offenders: an Extended Prospective Follow-Up Study," *Law and Human Behavior* 17 (2011).  And they admit that, "[h]istorical cases of sexual contact offenses, especially those committed by child pornography offenders who appeared to have no prior criminal history, may provide a window into undetected sexual offending, i.e., offenses that were not (at the time) reported to police or documented in file information." <u>Id</u>.

Therefore, since recidivism is defined in terms of subsequent arrests, low numbers of contact offenses based upon arrests is not surprising.  These results are explained by multiple factors.  First, child molesters do not boast about their crimes to the general public, but only between themselves.  Second, victims of sex crimes are reluctant to report such crimes because children are particularly reluctant to talk about sexual abuse. Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)); see e.g. Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)).  Therefore, any study which relies on subsequent arrest and convictions should be considered with caution.

The issue of recidivism begs the question of whether someone with a sexual attraction to children can be rehabilitated.  Pedophilia generally is treated with cognitive behavioral therapy. *See, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment*

17

*Outcomes, and Forensic Issues*, Ryan C. W. Hall, Md, and Richard C. W. Hall, Md, PA, Mayo Clin. Proc. (April 2007).  The therapy may be prescribed alone or in combination with medication. Id.  But unlike the successful treatment outcomes for most other mental illnesses, the outlook for successful treatment and rehabilitation of individuals with pedophilia is guarded. <u>Id</u>.

In summary, no study can confidently predict for the Court whether Close will commit a future child exploitation offense.  Through his behavior, statements, and digital media, Close has evidenced his sexual attraction to children and appears to have invested a significant amount of time recording his own sexually explicit images of the children trusted to his care as well as those depicted in the images he downloaded from the internet.  This should give the Court great pause when evaluating the likelihood that Close will recidivate in the future.

## IV.  <u>MONETARY PENALTIES</u>

### A.  <u>THE AMY, VICKY, AND ANDY CHILD PORNOGRAPHY VICTIM ASSISTANCE ACT OF 2018 (AVAA) GENERALLY</u>

The *Amy, Vicky, and Andy Child Pornography Victim Assistance Act* of 2018 (AVAA), enacted on December 7, 2018, made a number of changes to existing child pornography laws, specifically with regard to restitution. Specifically, the law: (1) provides that restitution must be ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim; (2) imposes a new special assessment for those defendants who are convicted of certain child pornography related offenses; (3) permits victims of child pornography trafficking offenses to seek a one-time payment of $35,000 from a reserve fund; (4) amends the definition of "sexually explicit conduct" under 18 U.S.C. § 2256(2); and (5) adds 18 U.S.C. § 3509(m)(3), which allows victims, their attorneys, and any purported expert to access a victim's own sexually explicit images during any criminal proceeding.

B.     PAROLINE V. UNITED STATES, THE 2014 U.S. SUPREME COURT CASE
       ON RESTITUTION IN CHILD EXPLOITATION CASES

In Paroline v. United States, 134 S. Ct. 1710 (2014), the Supreme Court held that a child-pornography victim was entitled to restitution from a possessor of her images, even though "the victim did not know who [the defendant] was and . . . none of her claimed losses flowed from any specific knowledge about him or his offense conduct." Id. at 1718, 1722.  Employing a proximate-cause standard, it explained that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id. at 1727.  The amount must not be "a token or nominal amount," even in a case involving possession (as Paroline was) or receipt and distribution (as here), as opposed to production. Id.  Rather, a "reasonable and circumscribed award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role" is necessary. Id.; see also id. (noting that such an award "serve[s] the twin goals of helping the victim achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims").

In deciding the appropriate amount of restitution, "a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." Id.  Importantly, "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." Id.; accord id. (reaffirming that it is "neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount").  Factors that may be relevant, if known, include the total "amount of the victim's losses caused by the continuing traffic in the victim's images," "the number of past criminal defendants found to have contributed to the victim's general

19

losses," "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses," "whether the defendant reproduced or distributed images of the victim," and "how many images of the victim the defendant possessed."  Id.  As the Supreme Court warned, however, "[t]hese factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders." Id.

C.    THE 2018 AVAA REGARDING RESTITUTION

As indicated, restitution to victims of convicted child pornography offenders is "mandatory."  18 U.S.C. § 2259.  The AVAA provides that any defendant convicted of "trafficking in child pornography" must pay a minimum of $3,000 in restitution per victim for each count of conviction.  Trafficking in child pornography is defined as violations of the following sections of Title 18 of the United States Code:

• Section 2251(d) [advertising or publishing child pornography];

• Sections 2252, 2252A(a)(1) through (5) [generally possession, receipt, transportation, distribution, and access with intent to view child pornography];

• Section 2252A(g) (in cases in which the series of felony violations exclusively involves violations of sections 2251(d), 2252, 2252A(a)(1) through (5), or 2260(b))[child exploitation enterprises]; and

• Section 2260(b) [importation of child pornography into the United States].

18 U.S.C. § 2259(c)(3).

The amount of restitution ordered is not dependent on a defendant's ability to pay. Instead, it is based upon a court's determination of the "full amount" of losses incurred by a victim as a result of the trafficking in child pornography depicting the victim. 18 U.S.C. §

20

2259(b)(2).  The term "full amount of the victim's losses" includes any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim; and in the case of trafficking in child pornography offenses, as a proximate result of all trafficking in child pornography offenses involving the same victim, including:

> (A) medical services relating to physical, psychiatric, or psychological care;

> (B) physical and occupational therapy or rehabilitation;

> (C) necessary transportation, temporary housing, and child care expenses;

> (D) lost income;

> (E) attorneys' fees, as well as other costs incurred; and

> (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(c)(2)(A)-(F).

The court "may not decline to issue an order under this section because of—(i) the economic circumstances of the defendant; or (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." 18 U.S.C. § 2259(b)(4)(B).

### D. RESTITUTION REQUESTS IN THIS CASE

Representatives for two of the production victims have submitted requests for restitution in this case.  Other victims from the downloaded material elected not to seek restitution when they learned of the number of victims in the produced images.   The family of Minor Victim #124 made a request for $915 for counseling and medication.  The family of Minor Victims #102 and 103 made a request for $34 for medication.

E.     FINE

The Government concedes Close does not have the current ability to pay a fine in this

matter and suggests that any analysis of Close' future ability to make money should be directed

toward restitution and his special assessment responsibilities.

F.     18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Close is also subject to a mandatory $5,000 Additional Special Assessment pursuant to

18 U.S.C. § 3014.  The statute states, in pertinent part:

> [I]n addition to the assessment imposed under section 3013, **the
> court shall assess an amount of $5,000 on any non-indigent
> person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in
> persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse
> of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity
> and related crimes)....
>
> 18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as

grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because the

defendant has been convicted of an offense under Chapter 110, the Court must impose this

additional special assessment unless it finds he is unable to pay; however, both the defendant's

current and future financial status is to be evaluated when making the indigency determination

under § 3014.  See United States v. Shepherd, 922 F.3d 753 (6th Cir. 2019).  See also   United

States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018).  That is, negative net worth at the

time of sentencing is not dispositive of the issue. <u>United States v. Kelley</u>, 861 F.3d 790, 801-802 (8th Cir. 2017). If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014." *Id*.

Thomas Close has the current and/or future ability to pay this special assessment. He is a high school graduate with a Bachelor of Arts in Mathematics and Computer Science. He even completed coursework for a master's degree in mathematics. He began his first job as a sophomore in high school and has maintained steady employment his entire adult life. Despite the fact that he has limited to no official assets, he does maintain a joint checking account with his mother.

Even in the absence of assets, Defendant will be in prison for at least the next 15 years, much longer if the proposed Guideline sentence is imposed, and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine and additional special assessment. In fact, the fine will not expire for 20 years from the date of his release from custody. 18 U.S.C. § 3613(b). Close victimized over 100,000 children that were depicted in the images he downloaded and at least 143 children by the sexually explicit images that he recorded. Based upon his assets and his future ability to earn money, he should be required to pay into the fund that will serve as a financial safety net for the victims that need it. Consequently, Close should be ordered to pay the $5,000 additional special assessment.

## V.     <u>CONCLUSION</u>

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that this Court accept the Crim. R. 11 (c)(1)(C) Plea Agreement negotiated by the parties and impose a term of imprisonment of 405 months, a term that is within the contemplated Guideline range of 324 to 405 months.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:     /s/ Carol M. Skutnik
Carol M. Skutnik (OH: 0059704)
Assistant U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3785
E-mail: carol.skutnik@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 9, 2020, copy of the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Carol M. Skutnik
Assistant U.S. Attorney

24